# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| 2Connect W.L.L. ) | ASBCA No. 59233 |
| ) | |
| Under Contract No. 2CON W 000276 ) | |

APPEARANCES FOR THE APPELLANT:     Shelly L. Ewald, Esq.
Scott P. Fitzsimmons, Esq.
   Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
McLean, VA

APPEARANCES FOR THE GOVERNMENT:     Robert Gorman, Esq.
   DISA Chief Trial Attorney
James W. Debose, Esq.
Christine Elizabeth Purvis, Esq.
   Trial Attorneys
   Defense Information Systems Agency
   Fort Meade, MD

## OPINION BY ADMINISTRATIVE JUDGE WILSON

This appeal originates from a cancellation of a delivery order issued by the Defense Information Systems Agency (DISA or government) to 2Connect W.L.L. (2Connect or appellant) for a telecommunications circuit. The parties could not agree on the costs allegedly incurred as a result of the cancellation. The cancellation stemmed from a successful protest by another offeror to the Government Accountability Office (GAO). Appellant contends that it is entitled to be reimbursed for its reasonably incurred costs for securing a telecommunications circuit necessary for performance of the contract. The government counters that, pursuant to the relevant Defense Federal Acquisition Regulation Supplement (DFARS) clause, the claimed cost of the telecommunications circuit is not an "actual nonrecoverable cost" that was reasonably incurred. The Board conducted a two-day hearing on entitlement and quantum.

## FINDINGS OF FACT

*The Basic Agreement*

1. On 9 December 2010, 2Connect and the government entered into a Basic Agreement (BA) for the acquisition of commercial telecommunication services. Under this agreement, appellant could compete with other agreement holders to fulfill DISA's telecommunications requirements. The agreement contained general terms and conditions that would be incorporated into subsequent orders for communication services that would

include other appropriate standard provisions. The BA included FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (JUN 2010) and deleted paragraph (l), Termination for the government's convenience, and replaced it with DFARS 252.239-7007, CANCELLATION OR TERMINATION OF ORDERS (NOV 2005), which reads as follows:

(a) If the Government cancels any of the services ordered under this agreement/contract, before the services are made available to the Government, or terminates any of these services after they are made available to the Government, the Government shall reimburse the Contractor for the actual non-recoverable costs the Contractor has reasonably incurred in providing facilities and equipment for which the Contractor has no foreseeable reuse.

(b) The amount of the Government's liability upon cancellation or termination of any of the services ordered under this agreement/contract will be determined under applicable tariffs governing cancellation and termination charges which –

(1) Are filed by the Contractor with a governmental regulatory body, as defined in the Rates, Charges, and Services clause of this agreement/contract;

(2) Are in effect on the date of termination; and

(3) Provide specific cancellation or termination charges for the facilities and equipment involved or show how to determine the charges.

(c) The amount of the Government's liability upon cancellation or termination of any of the services ordered under this agreement/contract, which are not subject to a governmental regulatory body, will be determined under a mutually agreed schedule in the communication services authorization (CSA) or other contractual document.

(d) If no applicable tariffs are in effect on the date of cancellation or termination or set forth in the applicable CSA or other contractual document, the Government's liability will be determined under the following settlement procedures –

(1) The Contractor agrees to provide the Contracting Officer, in such reasonable detail as the Contracting Officer

2

may require, inventory schedules covering all items of property or facilities in the Contractor's possession, the cost of which is included in the Basic Cancellation or Termination Liability for which the Contractor has no foreseeable reuse.

(2) The Contractor shall use its best efforts to sell property or facilities when the Contractor has no foreseeable reuse or when the Government has not exercised its option to take title under the Title to Telecommunications Facilities and Equipment clause of this agreement/contract. The Contractor shall apply any proceeds of the sale to reduce any payments by the Government to the Contractor under a cancellation or termination settlement.

(3) The Contractor shall record actual non-recoverable costs under established accounting procedures prescribed by the cognizant governmental regulatory authority or, if no such procedures have been prescribed, under generally accepted accounting procedures applicable to the provision of telecommunication services for public use.

(4) The actual nonrecoverable costs are the installed costs of the facilities and equipment, less cost of reusable materials, and less net salvage value. Installed costs shall include the actual cost of equipment and materials specifically provided or used, plus the actual cost of installing (including engineering, labor, supervision, transportation, rights-of-way, and any other items which are chargeable to the capital accounts of the Contractor) less any costs the Government may have directly reimbursed the Contractor under the Special Construction and Equipment Charges clause of this agreement/contract. Deduct from the Contractor's installed cost, the net salvage value (salvage value less cost of removal). In determining net salvage value, give consideration to foreseeable reuse of the facilities and equipment by the Contractor. Make allowance for the cost of dismantling, removal, reconditioning, and disposal of the facilities and equipment when necessary either to the sale of facilities or their reuse by the Contractor in another location.

(5) The Basic Cancellation Liability is defined as the actual nonrecoverable cost which the Government shall reimburse the Contractor at the time services are cancelled. The Basic Termination Liability is defined as the

3

nonrecoverable cost amortized in equal monthly increments throughout the liability period. Upon termination of services, the Government shall reimburse the Contractor for the nonrecoverable cost less such costs amortized to the date services are terminated. Establish the liability period as mutually agreed to but not to exceed ten years.

(6) When the Basic Cancellation or Termination Liability established by the CSA or other contractual document is based on estimated costs, the Contractor agrees to settle on the basis of actual cost at the time of termination or cancellation.

(7) The Contractor agrees that, if after settlement but within the termination liability period of the services, should the Contractor make reuse of equipment or facilities which were treated as nonreusable or non-salvageable in the settlement, the Contractor shall reimburse the Government for the value of the equipment or facilities.

(8) The Contractor agrees to exclude –

(i) Any costs which are not included in determining cancellation and termination charges under the Contractor's standard practices or procedures; and

(ii) Charges not ordinarily made by the Contractor for similar facilities or equipment, furnished under similar circumstances.

(e) The Government may, under such terms and conditions as it may prescribe, make partial payments and payments on the account against costs incurred by the Contractor in connection with the canceled or terminated portion of this agreement/contract. The Government may make these payments if in the opinion of the Contracting Officer the total of the payments is within the amount the Contractor is entitled. If the total of the payments is in excess of the amount finally agreed or determined to be due under this clause, the Contractor shall pay the excess to the Government upon demand.

(f) Failure to agree shall be a dispute concerning a question of fact within the meaning of the Disputes clause.

4

The BA also incorporated by reference the following clauses which state in pertinent part:

DFARS 252.239-7008, REUSE ARRANGEMENTS (DEC 1991)

(a) When feasible, the Contractor shall reuse canceled or terminated facilities or equipment to minimize charges to the Government.

....

(c) When there is another requirement or foreseeable reuse in place of canceled or terminated facilities or equipment, no charge shall apply and the Basic Cancellation or Termination Liability shall be appropriately reduced. When feasible, the Contractor shall promptly reuse discontinued channels or facilities for which the Government is obligated to pay a minimum service charge.

DFARS 252.239-7005, RATES, CHARGES, AND SERVICES (DEVIATION) (NOV 2005)

....

(f) Subject to the Cancellation or Termination of Orders clause, of this agreement/contract, the Government may stop the use of any service or facilities furnished under this agreement/contract at any time. The Government shall pay the Contractor all charges for services and facilities adjusted to the effective date of discontinuance.

(R4, tab 1 at 3, 29; tr. 2/69)

*Solicitation and Order/CSA Award*

2. On 1 April 2012, DISA issued Solicitation No. TSR RE12MAR125241 for a "high speed Synchronous Digital Hierarchy (SDH)/Synchronous Transport Module STM-4 AU 4 service" between a service delivery point at Camp Lemonier, Djibouti and Manama, Bahrain. Or, more plainly put, the government sought to lease a telecommunications circuit between the DISA Naval Support Activity in Bahrain and Camp Lemonier in Djibouti. The solicitation was limited to offerors with a current BA in place. The solicitation also contained the following provisions:

5

*10. Physical Plant and Infrastructure*: ...The Telecommunications Provider [TP] shall provide documentation on the path layout and on furnished and full documentation of installed equipment, to include interface diagrams and system configurations....

**A**. Information showing the route that the circuit primary path or that an intended pro[j]ect path traverses. Specific information that must be provided includes:
(1) International border crossings
(2) Demarc points between any vendors used to provide the service.

....

(5) Facilities (Central Office) locations
(6) Origin and destination of the STM-4 AU-4 (622MB) structured AU4 commercial leased SDH trunk (originating and terminating facilities)[.]

*14. Standard Provision – Four Quote Preparation (July 2009)*

Vendor/ [TP's] quote shall respond to each paragraph of this inquiry.... Vendor/TP shall agree to satisfy all technical aspects of inquiry.... Vendor's/TP's quote shall contain the applicable...charges for service...from subcontractors or other vendors/TPs.... Charges not included in quote shall not be added to subsequent invoices, and U.S. Government shall not be obligated to pay charges that are not specified in quote and authorized in resultant order or circuit demand....

*15. Standard Provision – Nine Standard Procedure (July 2009)*

One or more end points of this circuit terminate in non-NATO countries and/or NATO countries that do not have a national long lines agency (NALLA) and/or a NALLA accredited TP. Therefore, quotes from telecommunication Providers (TPS) possessing authorization to provide telecommunications service from appropriate national authorities will be considered. Quotes shall identify portions of service that will be provided using TP's own facilities as well as those that will be provided by subcontractor TPs, and shall identify all subcontractor TPs. Additionally, quotes shall provide evidence TP and all subcontractor TPs possess

6

required national authority authorizations for countries where this circuit terminates....

.....

*22. Standard Provision Thirty [30] – Contract Period-Indefinite Term-Inquiry (July 2010)*

Contract for this telecommunications service shall be an indefinite term contract with an estimated contract period of 60 months. However, this contract period is not guaranteed. Minimum service period shall be 1 month(s). Accordingly, after meeting minimum service period, U.S. Government may discontinue service, at no additional cost to U.S. Government. U.S. Government will provide vendor/telecommunications provider (TP) 30 days notice prior to discontinuing service.

In the event U.S. Government is unable to obtain quotes that meet this minimum service period, U.S. Government may consider quotes with a minimum service period greater than 1 month(s).

(R4, tab 2 at 2, 5-7, 10)

3. Offerors were informed that their price proposals would be evaluated on the basis of total price offered for the estimated contract period of 60 months (five years) (R4, tab 2 at 51). On 1 May 2012, 2Connect submitted its proposal to the government. The record reflects that 2Connect proposed a monthly rate of $235,000 for the first year with a Non-Recurring Charge (NRC)/setup fee of $75,000. (R4, tab 7; tr. 1/53) The proposal also included the physical system approach to meet the requirement as well as the infrastructure diagram and proposed circuit architecture description (R4, tab 7 at 74-76).

4. After appellant provided clarifications as to the proposed circuit which would avoid certain countries and cities along the route, and provided a detailed design/path layout (R4, tab 8 at 106-08), DISA awarded the CSA to another company. Appellant inquired as to the "reasoning employed" by the government in awarding the order to the other company (R4, tab 9). After a review of the calculations, DISA determined that appellant offered a lower price than the proposed awardee (R4, tab 12 at 131). On 29 September 2012, DISA cancelled the award (*id.*) and awarded the CSA (2CON W 000276) to 2Connect and incorporated its rates for service (R4, tab 10 at 126). The "SERVICE DATE", or commencement of services, was to occur on 30 November 2012 or "SOONER IF POSSIBLE" (*id.* at 115).

7

5. On 14 October 2012, 2Connect entered into an Irrevocable Right of Use (IRU)[1] agreement with GCCIX W.L.L. (GCCIX) for a segment of the circuit through the United Arab Emirates (UAE) and Saudi Arabia to connect with Fujairah, UAE. The agreement was for a 15-year period commencing 19 November 2012 with a lump sum payment of Bahraini Dinar (BHD) 816,480 for the circuit and BHD40,824 due annually for maintenance charges.[2] (R4, tab 27) An IRU is purchasing and owning capacity on a cable system for a number of years, usually 10-15 years, or the useful "life of the cable system." It differs from a lease in that the cost for an IRU is paid upfront and a lease is "taking the capacity on twelve month periods." (Tr. 1/42-44)

*Cancellation and Settlement*

6. By letter dated 25 October 2012, prior to commencement of services under the contract, the contracting officer (CO) issued a Stop Work Order due to a post-award protest filed with GAO challenging the award to 2Connect (tr. 2/141). The order read as follows:

> You are hereby instructed to neither continue performance nor issuance of orders for materials or services under this contract. You are directed to pass this Stop Work Order to all subcontractors for the subject contract with instruction to stop performance immediately. No additional costs shall be incurred regarding this contract.

(R4, tab 11) We find that services were never commenced under the contract.

7. On 28 January 2013, GAO sustained the protest, recommending that the agency reevaluate 2Connect's offer with regard to the response time and maximum repair time requirements stated in the solicitation (R4, tab 12). By letter dated 3 April 2013, the government, after reevaluation of 2Connect's offer, determined that it was unclear whether the offer was compliant and cancelled CSA 2CON W 000276 in accordance with clause 252.239-7007, Cancellation or Termination of Orders, under the BA (R4, tab 13).

8. On 17 April 2013, 2Connect acknowledged and countersigned the notice of cancellation via email and added:

---

[1] It is also referred to as an Indefeasible Right to Use in the telecommunications industry (*see* tr. 1/430). *Ansari v. Qwest Communications Corp.*, 414 F.3d 1214 (10th Cir. 2005).

[2] The record reflects a fixed exchange rate of 1 BHD to 2.65 USD (tr. 1/73-74).

For the purposes of reimbursement by the Government of costs incurred by 2Connect prior to the cancellation of this award, I would like to inform you that 2Connect incurred Non-recoverable costs of purchasing IRU bandwidth from GCCIX for STM4 bandwidth from GCCIX Silaa to Fujairah Cable Landing Station in anticipation of performance. Our claim for these costs is in the amount of BD857,304 (USD $2,274,015). I understand these costs to be recoverable under the FAR Section 31.205-42....

Can you please advise what type of documentation you require for the settlement proposal?

(R4, tab 14) The government responded to appellant's acknowledgement, by email dated 24 April 2013, advising that while FAR 31.205-42 generally discussed the allowability of certain termination costs, DFARS 252.239-7007 specifically governs this cancellation and should be relied upon when submitting its settlement request (R4, tab 15 at 142).

9. The record shows that appellant was able to cancel the other part of the circuit that was leased, however it was unable to cancel the portion of the circuit secured via IRU from GCCIX (app. supp. R4, tab UU; tr. 2/24). With regard to any further use of the IRU, appellant testified as follows:

Now, an IRU is from point A to point B. All of my customers, so it's going from Sila[a] to Fujairah. All of 2Connect's customer base, our entire customer base, requires circuits to Europe and North America. We have no customers that require circuits to Africa or Asia. So I had no internal use for this IRU.

...But because it wasn't terminating the UAE because it was leaving the UAE, I couldn't even use it for my own customers that might want connectivity to the UAE....

So I can't find any use for that circuit, there's no end customer, no corporate customer can use it; and unfortunately Sila[a], the only two carriers that are based in Sila[a] are GCCIX and Etisalat. So I can't even sell it to another carrier because they can't reach Sila[a], they're not in Sila[a]. So I'm hamstrung. That capacity sits there to this day unused.

Appellant also testified that it attempted to offer the circuit to other companies at the yearly Capacity Middle East telecommunications conference, to no avail. (Tr. 1/102-04) The

9

government offered no credible evidence to the contrary.[3] Moreover, both appellant and government witnesses testified that the capacity represented by the GCCIX IRU was offered to the government for its use, but the government chose not to avail itself of the offer (tr. 1/100-12, 2/75). Accordingly, we find that the IRU had no foreseeable reuse.

10. By letter dated 6 May 2013, appellant submitted its settlement proposal in the amount of $2,274,015. Appellant believed that the costs associated with purchasing the IRU were recoverable under the applicable DFARS clause because of the following: (1) DISA canceled the services ordered under the agreement/contract; (2) the cancellation occurred before the IRU was made available to the government, but after 2Connect purchased it; (3) the actual nonrecoverable costs were reasonably incurred, the purpose was to provide facilities and equipment to meet the contract requirements, and the IRU has no foreseeable reuse; (4) 2Connect has made its best efforts to re-sell the IRU, but has been successful; and (5) 2Connect recorded actual nonrecoverable costs under established accounting procedures. Appellant also provided backup documentation to show that it had paid the requested amount to GCCIX for the IRU. (R4, tab 16 at 149)

11. The contracting officer, Mr. Todd Zeitler, testified that a telecommunications circuit of the sort sought by DISA in this procurement was commonly provided by way of leases, because "generally...in the overseas markets the providers don't own all the fibre paths (tr. 2/102). "They have to go to—and especially when you're talking about multiple countries, which this one did, you know, traverse. So, they'd have to go to other, you know, companies to get part of that circuit." (*Id.*) Nevertheless, on 25 June 2013, the government declined to reimburse appellant as follows:

> As stated above, cancellation of this order is governed by DFARS 252.239-7007. This clause entitles a Contractor only to settlement costs for actual <u>property or facilities</u> that are <u>in the Contractor's possession</u> at the time of cancellation. Because the 15 year IRU lease does not constitute actual property or facilities that were in 2Connect's possession at the time of cancellation, your settlement proposal in the amount of $2,274,015.00 for an IRU to lease STM4 bandwidth from GCCIX covering 15 year period will not be reimbursed by the Government.

(R4, tab 17 at 163)

---

[3] The government argues in its brief that appellant failed to demonstrate that there was no foreseeable reuse for the IRU based on supposition and mere disagreement with the testimony provided at the hearing (gov't reply at 24-25). It offered no evidence to rebut appellant's sworn testimony.

12. By letter dated 2 July 2013, appellant requested that the government reconsider its determination regarding the allowability of the IRU costs incurred in furtherance of contract performance prior to the 25 October 2012 stop work order (R4, tab 18 at 168). The government responded, by letter dated 12 July 2013, reiterating its position that the IRU lease did not constitute actual property or facilities under DFARS 252.239-7007 and added that the 15-year period was not reasonably incurred (R4, tab 19 at 174).

13. The record reflects that the parties continued to negotiate up until November of 2013, whereupon appellant filed a certified claim dated 25 November 2013 (R4, tab 22).

14. At the hearing, appellant testified that, during the solicitation phase of the procurement, it anticipated that the 15-year IRU would be more cost effective than a yearly lease by the third year of the contract (tr. 1/125). Appellant contacted Etisalat directly to determine the reasonableness of the IRU with GCCIX (tr. 1/68-81). It received a quote for bandwidth in excess of the contractually required specification (STM-16 vs. STM-4) in order to make a comparison without tipping off Etisalat that it was requesting information on the same specification that GCCIX fulfilled to appellant (tr. 1/71). Appellant received a quote of $5,163,750 for an IRU for the STM-16 (app. supp. R4, tab F). When making the comparison, appellant proffered:

> [STM-1, STM-4, STM-16 and STM-64] are moving up four times the speed, so you go from 155 megabit to 622 megabit to 2.5 gigabit to 10 gigabit. So you're moving up a step of four each time. However pricing doesn't follow that same linear scale; pricing will only move up, whilst the speed will move up four times, pricing will move up about 2.4 times.
>
> So I know if I'm paying a dollar for an STM-1 and I want it to be an STM-4, I'm going to pay about 2.4 dollars. So you see how the speed will move up four times, but the price will generally go up about 2.4 times. It's a very good rule of thumb that I've found since I've been in the region for the last eleven years; it seems to be a very, very accurate way of determining what other speed costs will be if you know one of the costs.

(Tr. 1/72-73) If we compare the cost of the STM-16 IRU quoted by Etisalat ($5,163,750) to the price of the STM-4 IRU obtained from GCCIX ($2,165,672), we see that the price of the GCCIX IRU times 2.4 ($5,192,813) is in line with the Etisalat quotation of $5,163,750. We therefore find that the cost of the IRU secured by appellant was reasonable.[4]

15. By letter dated 23 January 2014, the CO denied the claim in its entirety (R4, tab 23).

---

[4] Appellant's testimony concerning the pricing factor of 2.4 was credible and undisputed.

16. On 31 March 2014, appellant filed a timely notice of appeal with the Board, which was docketed as ASBCA No. 59233 (R4, tabs 24, 25).

## DECISION

Appellant contends that it is entitled to the costs of its IRU, as the relevant clause, DFARS 252.239.7007, Cancellation Termination of Orders, allows for recovery because the government's narrow interpretation of "property or facilities" is "wholly tenuous and unsupported." Further, appellant argues that the 15-year IRU was reasonably acquired because the cost savings over a 5-year period were greater under the IRU than under a 5-year lease. (App. br. at 12-17)

The government counters that the disputed costs are not recoverable under the clear terms of the contract. It is unreasonable, the government contends, for DISA to underwrite appellant's business decision to secure a 15-year "lease" when the solicitation unambiguously advised vendors that the government could discontinue service at any time at no cost. Thus, the government concludes that allowing recovery of the 15-year IRU costs would contradict the plain language of the contract; result in an inequitable windfall for appellant, and would have a significant adverse impact on existing and future DoD contracts within the telecommunications service industry. (Gov't reply at 11)

Generally, whether termed a cancellation or a termination for convenience, the overall purpose of a termination for convenience settlement is to fairly compensate the contractor and to make the contractor whole for the costs incurred in connection with the terminated work. *Nicon, Inc. v. United States*, 331 F.3d 878, 885 (Fed. Cir. 2003). "A contractor is not supposed to suffer as the result of a termination for convenience of the Government, nor to underwrite the Government's decision to terminate." *Jacobs Eng'g Group, Inc. v. United States*, 434 F.3d 1378, 1381 (Fed. Cir. 2006) (quoting *Kasler Elec. Co.*, DOT CAB No. 1425, 84-2 BCA ¶ 17,374 at 86,566).

*Entitlement*

*Standard Provision 30 of the CSA*

The applicable regulation regarding telecommunication services found at DFARS 239.7410(a)(1) defines cancellation as "stopping a requirement after placing an order but before service starts"; while Subsection (a)(2) reads "Termination is stopping a requirement after placing an order and after service starts." The clause at DFARS 252.239-7007, paragraph (a), is consistent with these definitions. Finally, Subsection (b) of the regulation informs the reader to "[d]etermine cancellation or termination charges under the provisions of the applicable tariff or agreement/contract." Standard Provision 30 solely relates to terminations of orders/CSAs after service has commenced. Both parties reference the government's action as a termination or cancellation interchangeably. However, as stated *supra*, there is a distinction between the two – commencement of the

12

contracted services. Since services did not commence, the government cannot avail itself of the no-cost termination provision found at Standard Provision 30 (finding 6). Accordingly, the sole issue before us involves interpretation of DFARS 252.239-7007 and how it applies to the cancellation that occurred in this case.

*DFARS 252.239-7007*

The clause at subsection (a) provides:

> If the Government cancels any of the services ordered under this agreement/contract, before the services are made available to the Government...the Government shall reimburse the Contractor for the actual nonrecoverable costs the Contractor has reasonably incurred in providing facilities and equipment for which the Contractor has no foreseeable reuse.

Further, subsection (d)(4) reads:

> The actual nonrecoverable costs are "the installed costs of the facilities and equipment, less cost of reusable materials, and less net salvage value. Installed costs shall include the actual cost of equipment and materials specifically provided or used, plus the actual cost of installing (including engineering, labor, supervision, transportation, rights-of-way, and any other items which are chargeable to the capital accounts of the Contractor).

The government interprets this language to conclude that appellant's claimed costs do not meet the definition of an actual nonrecoverable cost. Specifically, the government would limit the recovery to costs for equipment or materials that were specifically provided or used and installed to support the particular requirement. Thus, the government concludes that appellant's costs for the use of existing or previously installed telecommunications facilities do not constitute an actual nonrecoverable cost under the clause (gov't br. at 17-18). We disagree.

The government's interpretation selectively reads out the Subsection (a) provision that the government shall reimburse the contractor for the actual nonrecoverable costs the contractor has reasonably incurred in providing facilities and equipment for which the contractor has no foreseeable reuse. Nowhere in that language does the clause limit recovery to newly constructed facilities. We cannot conclude that the clause is inapplicable to leased facilities and equipment or the same secured by IRU especially when the government expected the circuit would be provided by way of leased facilities. (Finding 11) Here, appellant submitted its infrastructure plan in accordance with the physical plant and infrastructure provision of the solicitation, including installed equipment (finding 3) and has demonstrated that it mitigated the cost impact that resulted from the

13

cancellation (finding 8). Thus, we conclude that the equipment costs were reasonably incurred, as the purpose was to provide facilities and equipment to meet the contract requirements (finding 14). Since we found that the IRU has no foreseeable reuse (finding 9), the government's arguments must fail.

With regard to the government's contention that allowing recovery would result in an "inequitable windfall" for appellant, the government looks past the Reuse Arrangement Clause from the BA that if DISA has another requirement for this area, it can use the IRU at no charge (finding 1). Appellant has proven that there is limited or no commercial use for the IRU (bandwidth and location). Both appellant and government witnesses testified that the capacity represented by the GCCIX IRU was offered to the government for its use, but the government chose not to avail itself of the offer (finding 9). Accordingly, the government's contention misses the mark.

*Quantum*

Based on the documentation submitted and testimony at the hearing, appellant has proved that it incurred $2,274,015.00 in nonrecoverable costs resulting from the cancellation of the contract.

## CONCLUSION

The appeal is sustained in the amount as specified above, with CDA interest from 25 November 2013.

Dated: 2 June 2017

OWEN C. WILSON
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

(Signatures continued)

14

I concur

I concur

_____
LYNDA T. O'SULLIVAN
Administrative Judge
Armed Services Board
of Contract Appeals

_____
RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59233, Appeal of 2Connect W.L.L., rendered in conformance with the Board's Charter.

Dated:

_____
JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

15